IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF FLORIDA
PENSACOLA DIVISION

ROBERT D. KORNAGAY,
     Plaintiff,

vs.                              Case No.: 3:11cv428/LAC/EMT

SERGEANT GIVEN, et al.,
     Defendants.

_____/

## ORDER, REPORT AND RECOMMENDATION

Plaintiff Robert D. Kornagay ("Plaintiff"), a Florida Department of Corrections ("FDOC") inmate, proceeds pro se and in forma pauperis in this action brought pursuant to 42 U.S.C. § 1983. The case was referred to the undersigned for the issuance of all preliminary orders and any recommendations to the district court regarding dispositive matters. *See* N.D. Fla. Loc. R. 72.2(C); *see also* 28 U.S.C. § 636(b)(1)(B)(C), and Fed. R. Civ. P. 72(b). Presently before the court are the motion for summary judgment pursuant to Fed. R. Civ. P. 56 filed by the nine FDOC employees who are named as Defendants in this case (doc. 102; exhs. A–Q at doc. 102-1–102-6), and Plaintiff's response in opposition (doc. 111; exhs. A–T1 at doc. 111-1; response supplemented at doc. 115). Also before the court is Plaintiff's motion for sanctions (doc. 126), which Defendants oppose (doc. 128). For the reasons set forth below, the court denies Plaintiff's motion for sanctions, and it recommends that Defendants' motion for summary judgment be granted in part and denied in part.

I.      BACKGROUND AND PROCEDURAL HISTORY

Plaintiff initiated this civil rights action on September 7, 2011 (doc. 1). In the second amended complaint (doc. 23), which is the operative pleading in this case, Plaintiff names as Defendants Sergeant F. Given ("Given"); Correctional Officer ("CO") W. Weekly ("Weekly"); CO A. Slattery ("Slattery"); CO Smith ("Smith"); CO W. Fenner ("Fenner"); Lieutenant A. Williams ("Williams");

CO D. Johnson ("Johnson"); CO J. Roberts ("Roberts"); and Sergeant M. Nolan ("Nolan"), all of whom worked at Santa Rosa Correctional Institution ("SRCI") where Plaintiff was housed when the events at issue in this case took place (*id.* at 1–4).[1]  Plaintiff alleges that his cell mate, Sterling Pope ("Pope"), raped him on July 8, 2010 (*id.* at 11).  According to Plaintiff, Defendants Given, Slattery, Weekly, Fenner, and Smith knew that Plaintiff was at risk of being raped by Pope but they refused to protect him (*id.* at 16).  Plaintiff further alleges that Defendant Given's refusal to protect him was in retaliation for Plaintiff's filing numerous grievances (*id.*).  Additionally, Plaintiff alleges that Defendants Given, Williams, Slattery, Johnson, Roberts, and Nolan were deliberately indifferent to his medical needs following the rape (*id.* at 17).  Suing Defendants in their individual capacities, Plaintiff seeks declaratory relief; punitive, compensatory, and nominal damages; costs and attorney's fees; and any other relief the court deems necessary (*id.* at 16–17).  After Defendants filed their motion for summary judgment (doc. 102), the undersigned issued an order informing the parties of the importance and ramifications of summary judgment consideration and providing them with information as to the requirements for materials submitted for review pursuant to Rule 56 (doc. 103).  Plaintiff's having filed his response in opposition to Defendants' motion for summary judgment and submitted evidence in support of his position (doc. 111, exhs. A–T1 at doc. 111-1; response supplemented at doc. 115), the motion for summary judgment is ripe for review.  Plaintiff's motion for sanctions (doc. 126, response in opposition at doc. 128) is also ripe.

II.     PLAINTIFF'S MOTION FOR SANCTIONS

        Prior to addressing Defendants' motion for summary judgment, the court considers Plaintiff's motion for sanctions under Fed. R. Civ. P. 11 (doc. 126).  In his motion Plaintiff argues that Defendants' counsel should be sanctioned for representing to the court that Defendant C. Smith [whose full name, as recently identified, is Craig W. Smith] was not involved in the July 8, 2010, events alleged by Plaintiff; according to Plaintiff, counsel has falsely represented that Plaintiff's allegations involve another officer with a similar name, Officer Christopher Smith, and not Defendant C. Smith

---

[1]  Most of the page numbers cited in this Report and Recommendation (including all citations to the second amended complaint (doc. 23)) are the numbers assigned by the court's electronic docketing system rather than the page numbers the parties may have designated.  However, for ease in reference, the numerous exhibits (Defendants filed approximately 175 pages of exhibits, and Plaintiff filed approximately 200 pages of exhibits), are cited by the letter and page designations assigned by the parties.

(*id.* at 2). In fact, Plaintiff submits, the SRCI second shift duty roster for July 8, 2010, shows that Defendant C. Smith was on-duty and that Officer Christopher Smith was off-duty (*id.* at 2). Plaintiff states he notified counsel that he must withdraw the false representation or be subject to sanctions, but counsel failed to do so (*id.* at 1).

Defendants respond that the motion for sanctions should be denied for procedural and substantive reasons (doc. 128). First, Defendants state that Plaintiff failed to confer with defense counsel prior to filing the motion as required by Local Rule 7.1(B), failed to observe Fed. R. Civ. P. 11(c)(2)'s twenty-one day "safe harbor" provision before filing the motion for sanctions, and failed to serve Defendants with a proposed copy of his motion for sanctions as Rule 11(c)(2) also requires (*id.* at 1–2). Second, earlier in this litigation, Defendant C. Smith informed counsel that he had no recollection of the events described in the complaint and thought Plaintiff must be referring to another officer with the surname "Smith" who worked on July 8, 2010 (*id.* at 2). Counsel states that he based the argument for dismissal of Defendant C. Smith, which is presented in Section V of the motion for summary judgment, on this information as well as on the duty roster for July 8, 2010, which he erroneously thought did not include the name of Defendant C. Smith (*id.*). Upon realizing that the duty roster did contain the name of Defendant C. Smith, counsel recontacted this Defendant, who informed counsel that he still had no recollection of any interaction with Plaintiff on the relevant day but conceded that, according to the schedule, he worked on July 8, 2010. Acknowledging that Defendant C. Smith was at work on July 8, 2010, Defense counsel now seeks to withdraw Section V of the motion for summary judgment which asserts otherwise, and he asks the court to deny Plaintiff's motion for sanctions for the procedural and substantive reasons stated.     "The purpose of Rule 11(c)(2)'s safe harbor provision is to allow an attorney who violates Rule 11 to correct the alleged violation within twenty-one days without being subject to sanctions." Peer v. Lewis, 606 F.3d 1306, 1315 (11th Cir. 2010). Here, Plaintiff's motion does not make clear that he observed Rule 11's twenty-one day safe harbor provision, and he does not challenge Defendants' assertion that he did not. Nor has Plaintiff disputed Defendants' assertion that he failed to serve them with a copy of the proposed motion for sanctions, as Rule 11(c)(2) also requires. For these reasons alone, Plaintiff's motion is due to be denied. Moreover, although Defendants' initial factual contention that Defendant C. Smith

was not working on July 8, 2010, is contrary to the evidence,[2] defense counsel has now acknowledged his error and corrected it.  Plaintiff has thus suffered no prejudice as a result of the error.  As requested by Defendants, Section V of the motion for summary judgment—which asserts that Defendant C. Smith was not present during the alleged events of July 8, 2010, and thus should be dismissed from the action—is deemed withdrawn and shall not be considered (*see* docs. 128 at 3, 129).  Plaintiff's motion for sanctions (doc. 126) is denied.

III.    MATERIAL FACTS

As this case comes before the court on Defendants' motion for summary judgment, the court views the facts in the light most favorable to Plaintiff, the non-moving party, *see* Hairston v. Gainesville Sun Publ'g Co., 9 F.3d 913, 918 (11th Cir. 1993), drawing those facts from the pleadings, depositions, and other evidentiary materials on file.  Nevertheless, the court observes that what are stated as "facts" herein for purposes of summary judgment review may not be the actual facts.  *See* Montount v. Carr, 114 F.3d 181, 182 (11th Cir. 1997).

With regard to the factual positions asserted by the parties, the court applies the standard set forth in Rule 56(c) of the Federal Rules of Civil Procedure, which provides in relevant part:

> **(1) Supporting Factual Positions.**  A party asserting that a fact cannot be or is genuinely disputed must support the assertion by:
>
>> **(A)** citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials; or
>>
>> **(B)** showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact.
>
> . . . .
> **(4) Affidavits or Declarations.**  An affidavit or declaration used to support or oppose a motion must be made on personal knowledge, set out facts that would be admissible

---

[2] Rule 11 is violated when: (1) a paper is presented for "any improper purpose, such as to harass or to cause unnecessary delay or needless increase in the cost of litigation"; (2) the legal contentions are not "warranted by existing law" or by a "nonfrivolous argument" for changing existing law; or (3) the factual contentions lack evidentiary support. Fed. R. Civ. P. 11(b).

in evidence, and show that the affiant or declarant is competent to testify on the matters stated.

Fed. R. Civ. P. 56(c) (2010).  If a party fails to properly support an assertion of fact or fails to properly address another party's assertion of fact as required by Rule 56(c), the court will consider the fact undisputed for purposes of the motion for summary judgment, or grant summary judgment if Defendant's motion and supporting materials—including the facts considered undisputed—show that Defendant is entitled to it.  *See* Fed. R. Civ. P. 56(e)(2, 3) (2010).

Finally, any facts included in Defendants' statement of material facts that are not controverted in Plaintiff's response are deemed admitted.  *See* N.D. Fla. Loc. R. 56.1(A) (all material facts set forth in moving party's statement of undisputed material facts will be deemed admitted unless controverted by statement required to be filed and served by opposing party).

The parties present widely divergent facts.  Below, the court sets forth Defendants' statement of material facts, and follows with Plaintiff's.[3]  Much of Defendants' statement is recited verbatim (doc. 102 at 2–5).[4]  Plaintiff's lengthy statement (doc. 111 at 1–15) has been abbreviated.

<u>Defendants' Statement of Material Facts</u>

Plaintiff is an admitted prevaricator who lies to protect his interests (doc. 102 at 2, referencing Defendants' exh. A at 76–77 and exh. A at 123) [Kornagay deposition by oral examination].  When Plaintiff admitted that he was a liar at his February 8, 2013, deposition, he had already stated three times that he did not lie (*id.*, comparing exh. A at 4, 19, 23, 49 with exh. A at 76–77).  Plaintiff is a

---

[3] Defendants' motion references seventeen exhibits, and Plaintiff's response references forty-five exhibits. Documents submitted in support of or in opposition to a motion for summary judgment must be authenticated by and attached to an affidavit of a person through whom the documents could be admitted as evidence. <u>Saunders v. Emory Healthcare, Inc.</u>, 360 F. App'x 110, 113 (11th Cir. 2010) (*per curiam*); *see also* Fed. R. Civ. P. 56(c).  Some of the evidence the parties have submitted in this case might not be properly authenticated or might not be in admissible form. For example, Plaintiff's declarations and depositions by written question are photocopies, not originals; nevertheless, the documents appear to have been executed in satisfactory conformance with the requirements of 28 U.S.C. § 1746 or notarized.  Also, Defendants submitted some of the Inspector General's Report (as did Plaintiff), but the court could not locate an affidavit of authentication for this document.  In Defendants' evidence, however, there are more recently executed declarations from individuals which swear that the statements attributed to them in the Inspector General's Report are true and correct.  In any event, neither party has objected to any of the other's evidence on the grounds of authenticity or admissibility.  For purposes of this Report and Recommendation the court cites to the parties' evidence without explicit consideration of its authenticity or admissibility.

[4] A list of Defendants' referenced exhibits may be found at Document 102, p. 14.  Plaintiff's exhibits are listed at Document 111-1, pp. 1–2.

violent individual and a registered sexual predator (*id.*, referencing exh. A at 117–118, 122–124). Plaintiff is a former member of the gang "the Bloods" and is capable of defending himself (*id.*, referencing exh. A at 124).

There is no evidence that Pope ever sexually assaulted another inmate prior to July 8, 2010 (doc. 102 at 2, referencing exh. A at 118–119). Prior to July 8, 2010, Plaintiff and Pope agreed to tell Defendant Given that they were having problems in order to get Pope removed from the cell and get a homosexual inmate moved into the cell with Plaintiff (*id.*, referencing exh. B at 5–6 [Inspector General's Report]; exh. D [Pope declaration]).

At approximately 2:15 p.m. on July 8, 2010, Plaintiff yelled out of his window at Defendants Williams and Given, who were standing nearby (doc. 102 at 2). The officers approached the cell window, and Plaintiff stated that if Pope and he were not separated someone was going to get hurt. Plaintiff and Pope were removed from the cell and taken to separate shower cells. Due to his threat of violence, Plaintiff was warned that he may get a disciplinary report. When told he may get a disciplinary report for making a verbal threat, Plaintiff became upset and caused a commotion (*id.* at 3, referencing exh. B at 5, 6, and 36; exh. E [Williams declaration]). At approximately 2:55 p.m., the second shift was relieved by the third shift, and Defendants Given, Weekly, Slattery, and Fenner left for the day (*id.*, referencing exh. A at 32:23–33:5). Plaintiff never alleged to any of the officers on the second shift that he had been raped (*id.*, exh. B at 5, 6, 34, 35, and 38; exh. F [Given declaration]; exh. G [Weekly declaration]; exh. H [Slattery declaration]; exh. I [Fenner declaration]).

At approximately 4:28 p.m., Defendant Johnson heard and observed Plaintiff kicking his cell door (doc. 102 at 3, referencing exh. J [Daily Record of Special Housing for Kornagay]). Officer Johnson counseled Plaintiff, but Plaintiff refused to cease his actions, which were creating a disturbance in the wing (*id.*, referencing exh. B at 12–13; exh. K [Johnson declaration]). Due to the disturbance, Defendant Johnson called Lt. Nelson [who is not named as a Defendant in this action] at approximately 4:30 p.m. and asked him to come to D dormitory, where Pope and Plaintiff were housed (*id.*, referencing exh. P [Nelson declaration]). At approximately 5:05 p.m., Lt. Nelson entered D dormitory and was advised that Plaintiff was kicking his door and causing a disturbance. Lt. Nelson approached Plaintiff's cell to counsel him. Plaintiff told Lt. Nelson that he had been sexually

assaulted by Pope (*id.*).[5]  Plaintiff submitted to wrist restraints and was taken to the medical triage room (*id.*, referencing exh. B at 9–11; exh. P).

At approximately 5:40 p.m., Defendants Roberts and Johnson escorted Plaintiff to the Main Unit Multi-Treatment Building (doc. 102 at 3).  At approximately 5:45 p.m., Nurse Donahoo examined Plaintiff, including his anal area, and noted no injuries (*id.* at 4, referencing exh. C at 21, 23; exh. L [Donahoo declaration]).  At approximately 5:50 p.m., Plaintiff was escorted to the infirmary and secured in cell I2106S (*id.* at 3, referencing exh. B at 12–15; exh. P).  Plaintiff was alone in this cell for about six hours (*id.*, referencing exh. A at 119:12–23).  The other inmate, Pope, was examined at 6:00 p.m., and no injuries were noted.  Pope stated to the nurse that the alleged assault never happened (*id.* at 4, referencing exh. B at 19–20).

At approximately, 8:42 p.m., the Sexual Assault Response Team ("SART") was notified of Plaintiff's allegations (doc. 102 at 4, referencing exh. B at 3; exh. P), and it arrived on scene at approximately 11:15 p.m. (*id.*, referencing exh. C at 20 [Kornagay medical records]).  Plaintiff was examined at 11:30 p.m., when  Nurse Donahoo noted some minor red marks on Plaintiff's forehead that had not been present at her earlier examination (*id.* at exh. L).  The SART nurse noted that Plaintiff's anus had some reddened and raw areas (*id.,* referencing exh. B at 4).[6]  No other injuries were noted.  Plaintiff was provided additional medical instruction at 12:45 a.m. and at 1:15 a.m. on July 9, 2010 (*id.*, referencing exh. C at 20).

The Inspector General's Office conducted an investigation of the incident and concluded there was insufficient evidence to support the allegation that Plaintiff was sexually assaulted by Pope (doc. 102 at 4).  The Inspector also concluded there was insufficient evidence to support the allegations that Defendant Given had knowledge of or had ignored a sexual assault allegation made by Plaintiff (*id.*, referencing exh. B).  During the investigation, evidence was found that suggested Plaintiff was trying to manufacture declarations from other inmates to further a false civil suit (*id.* at 4, referencing exh.

---

[5]  Defendants submit that Plaintiff's statement to Lt. Nelson at approximately 5:05 p.m., was the first time Plaintiff reported the alleged rape.  In their answer, however, Defendants admit that at approximately 3:05 p.m., shortly after the third shift began, Plaintiff informed Defendants Johnson and Roberts that he had been raped (*see* doc. 79, #31; *see also* doc. 115).

[6]  Defendants state that the reddened and raw areas were on Plaintiff's anus, but the record actually states these areas were in his rectum (*see* exh. B at 4).

B at 5, 37).  Also, a letter was found apparently written by Pope indicating Plaintiff fabricated the story regarding the sexual assault (*id.* at 5, referencing exh. B at 22).  Further, Plaintiff told two of the Defendants that he had not been raped and that he made the story up in order to get out of the dormitory (*id.* at 5, referencing exh. B at 13, 15; exh. K; exh. Q [Roberts declaration]).  Plaintiff refused to make a written statement immediately after the alleged incident (*id.*, referencing exh. B at 44).

No inmate witness could see into Plaintiff's cell on July 8, 2010 (doc. 102 at 5, referencing exh. A at 63:17–19).  There is no medical evidence that Plaintiff was in dire need of medical care after the July 8, 2010 alleged rape, and Plaintiff was given medical care on the same day (doc. 102, referencing exh. C at 20–23).  The Office of the State Attorney declined to go forward with a criminal case concerning Plaintiff's allegations due to lack of evidence (*id.* at 5, referencing exh. B at 6 and 39).  Medical records created at Duval County Jail in November of 2010 show Plaintiff reported he had never had sex with a male and had no sexual partners in the twelve months prior to November 2010 (*id.*, referencing exh. C at 1).

Plaintiff's Statement of Material Facts

Plaintiff has never claimed or admitted he was a prevaricator who lied to protect his interests, though he acknowledges he has lied "in order to protect [his] safety [i]f an inmate ask[s] [him] what happened" (doc. 111 at 1, referencing Plaintiff's exh. A at 77 [Kornagay deposition taken by Defendants]).  Plaintiff does not consider himself to be a violent individual (*id.* at 2, referencing exh. A at 117).  After the sexual assault Plaintiff was viewed as being weak, causing him to resign from "the Bloods" (*id.*, referencing exh. B at 1 [Kornagay declaration]).  Plaintiff is capable of defending himself against an average fighter but Pope is not an average fighter (*id.*, referencing exh. C at 2 [Alvin C. Thompson deposition by written question], exh. D [Pope deposition by written question], exh. E [Demettius Williams declaration]).  Defendants Weekly, Fenner, Slattery, and Given were aware that Pope was well-trained and considered to be an "advanced" fighter (*id.*).

In May 2010 Defendant Given required Plaintiff to give him copies of all the grievances Plaintiff had filed, which Defendant Given examined and returned to Plaintiff (doc. 111 at 3,

referencing doc. 23 at 5,[7] exh. F at 5 [Ryan Parker deposition by written question], exh. I [grievance log #1005-119-227]). Defendant Given stated to Plaintiff, "I have broke the best writ writers in D.O.C., and I'm going to break you the hard way[.] It might not be right now, but it will be soon, mark my word." Defendant Given made similar remarks to Plaintiff through May and June 2010 (*id.*, referencing doc. 23 at 8, exh. F at 5).

At approximately 5:00 a.m., on July 8, 2010, Plaintiff awoke to find Pope masturbating while looking directly at him. Plaintiff confronted Pope, who struck him on the nose, causing a nosebleed (doc. 111 at 3, referencing exh. A at 30–31, exh. B at 1–2). Before leaving for the recreation yard, Pope touched his own penis and stated to Plaintiff, "you either are going to give me some ass or I'm going to take some" (*id.*, referencing exh. B at 2). At approximately 8:00 a.m., when Pope was still out of the cell, Plaintiff informed Defendant Given of Pope's conduct and Plaintiff's fear of being raped (*id.*, referencing doc. 23 at 8–9, exh. G at 4, 9 [Thomas E. Brooks deposition by written question]). Defendant Given responded, "[you're] always writing grievances or complaining about something, [you're] just a trouble maker, so I don't want to hear that shit" (*id.*, referencing doc. 23 at 8). When Defendant Given entered the recreation yard, he stated to Defendants Weekly, Fenner, and Slattery that Plaintiff was "crying for our help because inmate Pope is trying to take his ass. I say since he wants to write us up on every corner, we let him fight for his ass" (*id.*, referencing exh. J [Larry Jenkins declaration]). The other officers laughed and "slapped high fives" in agreement (exh. J). Defendant Weekly returned Pope to the cell after the recreation period (*id.*, referencing exh. B at 2). Plaintiff informed Defendants Weekly, Slattery, and Fenner during the course of their security checks about Pope's conduct that morning and Plaintiff's fear of being raped by Pope (*id.* at 5, referencing doc. 23 at 6, exh. A at 30–33, exh. G at 2–3, exh. K at 1–5). In response, Defendants

---

[7] Plaintiff signed his complaint under penalty of perjury. Therefore, the factual allegations in the complaint may be used as an opposing affidavit. *See* Perry v. Thompson, 786 F.2d 1093, 1095 (11th Cir. 1986); *see also* 28 U.S.C. § 1746 (setting forth requirements for unsworn declarations under penalty of perjury). To function as an opposing affidavit, a complaint must be based on personal knowledge and set forth specific facts admissible in evidence. Fed. R. Civ. P. 56(c); Perry, *supra*. Accordingly, the court may consider those portions of Plaintiff's complaint that meet the personal knowledge and specificity requirements as part of Plaintiff's opposition to the motion for summary judgment. *See also* Moulds v. Bullard, 345 F. App'x 387, 391 (11th Cir. 2009) ("[S]pecific facts pled in a sworn complaint must be considered in opposition to summary judgment.") (citing Perry); Shaw v. Cowart, 300 F. App'x 640, 645 (11th Cir. 2008) ("Facts alleged by the plaintiff in a sworn pleading" must be considered in opposition to summary judgment).

Slattery and Weekly told Plaintiff they would inform Defendant Given about the situation or that they were too busy to "deal with [his] crying"; Defendant Fenner told Plaintiff to "[j]ust file another one of your grievances about it" (*id.*, referencing doc. 23 at 9, exh. A at 30–34, exh. G at 2–9, exh. K at 2–5 [Damien Davis deposition by written question]).

When "it became obvious" that Defendants were not going to help Plaintiff, Pope choked Plaintiff and tried to force him to perform oral sex (doc. 111 at 5, referencing doc. 23 at 10, exh. A at 35). Plaintiff attracted the attention of Defendant Smith and told him what was happening; Smith "sarcastically" ordered the inmates to stand in separate ends of the cell while he went for help, but Smith never returned (*id.* at 6, referencing doc. 23 at 10, exh. G at 9, exh. C at 4). At approximately 1:00 p.m. Pope forced Plaintiff to perform oral sex "in different sessions, stopping whenever a[n] officer came on the wing" (*id.*, referencing doc. 23 at 11). This conduct continued until approximately 1:40 p.m., when—after knocking Plaintiff's head against the wall—Pope raped Plaintiff anally, with his penis and fingers (*id.*).

At some point Plaintiff was able to bang on his cell door and yell for help; other inmates also began kicking their cell doors to attract attention (doc. 111 at 6–7, referencing doc. 23 at 11, exh. G at 4, exh. K at 2). During this time Defendant Given was heard over the intercom "making lewd sounds as if to simulate the sounds of sexual intercourse" (*id.* at 7*,* referencing doc. 23 at 11, exh. G at 6, exh. K). At approximately 2:15 p.m., Plaintiff saw Defendants Given and Williams outside his cell. Plaintiff informed Defendant Given that he had been raped by Pope and requested help (*id.*, referencing doc. 23 at 11, exh. P at 2 [Defendant Williams response to informal grievance]). Defendant Given advised Defendant Williams of this information (*id.*, referencing exh. P at 1, exh. Q [Derrick Allen declaration]). At approximately 2:28 p.m., Defendants Given and Slattery removed Plaintiff and Pope from the cell and placed them in separate shower cells (*id.*, referencing doc. 23 at 12, exh. P at 1). When he was being transferred to and when he was in the shower cell, Plaintiff continued to tell Defendants Given and Slattery that he was in pain and showed them his bloody underwear and blood on his fingers that had transferred from his buttocks (*id.*, referencing doc. 23 at 12, exh. G at 5, exh. K at 5–6). Defendant Given denied his request for medical treatment (*id.*, referencing doc. 23 at 12, exh. G at 9, exh. K at 6). Defendants Given and Slattery saw Plaintiff

collapse on the floor but still did not contact the medical department or provide him with pain medication (*id.*, referencing doc. 23 at 12, exh. G at 6).

At approximately 3:05 p.m., shortly after the third shift began, Plaintiff informed Defendants Johnson and Roberts that he had been raped and needed medical attention, showing them his bloody underwear and blood dripping down his leg (doc. 111 at 8, referencing doc. 23 at 12, exh. G at 6, exh. D at 2–3, exh. K at 3). Defendant Johnson told Plaintiff "we don't have time to escort no cry babies to medical or to get the nurse down here. We have to shower all these inmates, feed all these inmates, and pick up laundry, so act like you [are] in prison for once and toughen up." Defendant Roberts stated "you could go cry to the sergeant (defendant Nolan) about seeing medical, but he won't override our decision" (*id.*, referencing doc. 23 at 12–13, exh. D at 3). Plaintiff was escorted back to his cell, where he was housed alone. When Plaintiff asked to speak with Defendant Williams, Defendant Johnson stated, "Lt. Williams already know[s] your little Bo-Bo is bleeding and hurting. Before he went home, him and Sgt. Given were cracking about it" (*id.* at 9, referencing doc. 23 at 13, exh. Q). At approximately 3:30 p.m., Plaintiff informed Defendant Nolan that he had been raped and needed medical attention because he was in pain and bleeding; Plaintiff showed Defendant Nolan the blood-stained napkin he was using to clean himself (*id.,* referencing doc. 23 at 13). Defendant Nolan advised him to wait a few minutes so he could get someone to escort Plaintiff to medical; after speaking with Defendants Johnson and Roberts, Defendant Nolan told Plaintiff to clean up the blood and Plaintiff might be able to see medical staff when tasks in the dormitory had been completed. Plaintiff requested pain medication from Defendants Nolan, Johnson, and Roberts, but they refused (*id.*, referencing doc. 23 at 13–14).

At approximately 4:15 p.m., when Plaintiff became dizzy and experienced sharp abdominal pain, he started to bang on his cell door to attract attention (doc. 111 at 9, referencing doc. 23 at 14). Defendant Johnson refused to get help for Plaintiff; instead Defendants Johnson and Roberts taunted Plaintiff (*id.*, at 10, referencing doc. 23 at 14, exh. G at 9, exh. K at 2–6). After showers, dinner, and laundry pick-up for the dormitory had been completed, Defendant Johnson contacted Lt. Nelson, whom Plaintiff informed of the rape (*id.*, referencing doc. 23 at 14, exh. S [Nelson incident report]). At approximately 6:00 p.m., Plaintiff was taken to the medical triage room (*id.*, referencing exh. S, exh. T at 1 [Nolan admissions]). At approximately 6:10 p.m., Defendants Roberts and Johnson escorted

Plaintiff to the Main Unit Multi-Treatment Building. At approximately 6:20 p.m., Nurse Donahoo examined Plaintiff and questioned him about the assault (*id.* at 10, referencing exh. S). Plaintiff and Pope, who had also been taken to the Main Unit Multi-Treatment Building, were both fully clothed and restrained when given physical examinations (*id.* at 11, referencing exh. B at 3, exh. H [Pope declaration and letter]). Nurse Donahoo informed Plaintiff that she was not trained to handle sexual assault cases and that he would be given a full examination by the SART when it arrived (*id.*, referencing exh. B at 3). At approximately 6:30 p.m., Plaintiff and Pope were taken to the infirmary (*id.* at 11, referencing exh. S at 2). Plaintiff was housed alone in a cell, as was Pope, but a prison official stood outside who could monitor both of them through a glass window; also, Plaintiff's cell had a camera which permitted remote monitoring (*id.*, referencing exh. B at 3, exh. H).

During his examination by the SART nurse, for the first time Plaintiff was required to remove his underwear (doc. 111 at 11). The internal examination revealed reddened and raw areas at the top and bottom of Plaintiff's rectum (*id.* at 11–12, referencing exh. B at 3, exh. R at 4 [Inspector General's Report]). The SART nurse's findings, which are contained in the Inspector General's Report, are not recorded in Plaintiff' SRCI medical record.[8] Plaintiff was given treatment to prevent sexually transmitted disease and infection and for pain (*id.*, referencing doc. 23 at 11, exh. B-1 at 5 [Kornagay medical records], exh. F-1 [Pope medical record[9]], exh. B at 4). When questioned about failing to document the injury to Plaintiff's forehead, Nurse Donahoo noted the injury in his record (*id.* at 12, referencing exh. B at 3, exh. B1 at 2–3).

Prior to July 8, 2010, Pope had numerous sexual misconduct disciplinary reports for masturbating, and Pope's color-coded "face" sheet on the cell door indicated he was a high risk sexual predator (doc. 111 at 2, referencing exh. H at 1; exh. B at 1). Plaintiff and Pope never made any type of agreement to tell Defendant Given that they were having problems in order to have a homosexual inmate moved into the cell with Plaintiff (*id.*, referencing exh. B at 1). Plaintiff was never warned that

---

[8] Plaintiff asserts that the original medical records created by the SART nurse accurately documented his complaints of dizziness, sharp pain in his lower abdomen, bleeding from his rectum, and body numbness from blood loss and pain, and that the records created by Nurse Donahoo are inaccurate and misleading (doc. 111 at 20 n.1). According to Plaintiff, the SART nurse's primary "records mysteriously disappeared" (*id.*).

[9] Because of the inclusion of Pope's medical records, the court shall order that Plaintiff's response to the motion for summary judgment be sealed.

he may receive a disciplinary report for a verbal threat (*id.* at 8, referencing exh. B at 3, exh. R at 6). On July 15, 2010, Defendant Given asked Pope to copy a note which stated that Plaintiff and Pope had agreed to tell authorities they were having problems getting along together so that Pope could be moved to another cell; Defendant Given later submitted the note to investigators "under the guise of him intercepting evidence of Plaintiff's alleged plot to get even" with him (*id.* at 14, referencing exh. H at 1–2).

Because Plaintiff is a prisoner proceeding pro se and almost all of his witnesses are prisoners with no formal education, Plaintiff assisted his witnesses in preparing their accounts of the incident by formatting their statements, checking the statements for accuracy, and making any changes before the witnesses signed them[10] (doc. 111 at 14). At no time did Plaintiff inflict injury to his own head or rectum (*id.* at 12, referencing exh. B at 4). Plaintiff never told any of the Defendants that he had not been raped or that he had made the story up (*id.*, referencing exh. B at 4). Any statements by Plaintiff reflected in Duval County Jail records dated November 2010 concerning his recent sexual history was a "defense mechanism" or "coping skill[ ]" on Plaintiff's part, "a way of trying to forget what happened to him" (*id.*, referencing exh. B at 4).

As the foregoing statements makes clear, Plaintiff and Defendants agree on virtually none of the relevant facts of this case, beyond that Plaintiff and Pope were housed together on July 8, 2010, that Plaintiff alleges Pope raped him, and that Plaintiff received several medical examinations after the alleged rape. Under Defendants' version of the facts, no rape occurred—and thus there was no failure to protect Plaintiff from rape.[11] Under Plaintiff's version of the facts, the rape did occur, and Defendants had the knowledge—based on his repeated reports that he feared Pope would rape him and his pleas for protection—and the opportunity to prevent the rape but they intentionally failed to take any action to protect him. As to Plaintiff's medical claim, Defendants contend—and Plaintiff disputes—that after the alleged rape at most Plaintiff had minor, probably self-inflicted injuries for which he received adequate and sufficiently timely medical attention. With respect to Plaintiff's

---

[10] Plaintiff likens his actions to those taken by defense counsel when preparing Pope's declaration, which was submitted with Defendants' motion for summary judgment (doc. 111 at 14, referring to defense exh. D).

[11] Even if the facts show a rape did occur, Defendants argue, Defendants Slattery, Fenner, and Weekly had no objective knowledge of a serious risk of harm to Plaintiff and acted, at most, negligently.

assertion that Defendant Given retaliated against him by facilitating the rape, Plaintiff identifies facts showing that prior to the alleged incident Defendant Given threatened Plaintiff for being a "writ writer," facts which Defendants do not address.

## IV. SUMMARY JUDGMENT STANDARD

In order to prevail on their motion for summary judgment, Defendants must show that Plaintiff has no evidence to support his case or present affirmative evidence that Plaintiff will be unable to prove his case at trial. *See* Celotex Corp. v. Catrett, 477 U.S. 317, 322–23 (1986). If Defendants successfully negate an essential element of Plaintiff's case, the burden shifts to Plaintiff to come forward with evidentiary material demonstrating a genuine issue of fact for trial. *Id.* The "mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247–48 (1986). A dispute is "genuine" if the "evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.*, 477 U.S. at 248. A fact is "material" if it "might affect the outcome of the suit under the governing law." *Id.* Plaintiff must show more than the existence of a "metaphysical doubt" regarding the material facts. Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986). Speculation or conjecture from a party cannot create a genuine issue of material fact. *See* Cordoba v. Dillard's, Inc., 419 F.3d 1169, 1181 (11th Cir. 2005). "A mere scintilla of evidence in support of the nonmoving party will not suffice to overcome a motion for summary judgment." Young v. City of Palm Bay, Fla., 358 F.3d 859, 860 (11th Cir. 2004); *see also* Celotex Corp., 477 U.S. at 324. Plaintiff must either point to evidence in the record or present additional evidence sufficient to withstand a directed verdict motion at trial based on the alleged evidentiary deficiency. *See* Celotex Corp., *supra*; Owen v. Wille, 117 F.3d 1235, 1236 (11th Cir. 1997) (Rule 56 requires the nonmoving party to go beyond the pleadings and by his or her own affidavits, or by the depositions, documents, affidavits or declarations, admissions, interrogatory answers or other materials on file designate specific facts showing that there is a genuine issue for trial); Hammer v. Slater, 20 F.3d 1137 (11th Cir. 1994).

Evidence presented by Plaintiff in opposition to the motion for summary judgment, and all reasonable factual inferences arising from it, must be viewed in the light most favorable to him. *See*

Adickes v. S. H. Kress & Co., 398 U.S. 144, 157 (1970); Jones v. Cannon, 174 F.3d 1271, 1282 (11th

Cir. 1999). Nonetheless, Plaintiff still bears the burden of coming forward with sufficient evidence

of every element that he must prove. *See* Celotex Corp., 477 U.S. at 317. A motion for summary

judgment should be granted if "the movant shows that there is no genuine dispute as to any material

fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); Celotex

Corp., 477 U.S. at 322.

V.      DISCUSSION

        A.      Failure to Protect

        A claim that a corrections official failed to protect an inmate from violence at the hands of

another inmate arises under the Eighth Amendment. In order to state a claim for a violation of his right

to be free from cruel and unusual punishment, "there must be at least some allegation of a conscious

or callous indifference to a prisoner's rights, thus raising the tort to constitutional stature." Williams

v. Bennett, 689 F.2d 1370, 1380 (11th Cir. 1982) (quoting Wright v. El Paso County Jail, 642 F.2d

134, 136 (5th Cir. 1981)). "An official's deliberate indifference to a known danger violates an

inmate's Eighth Amendment rights." McCoy v. Webster, 47 F.3d 404, 407 (11th Cir. 1995). Prison

officials have a duty to protect prisoners from violence at the hands of other prisoners. Farmer v.

Brennan, 511 U.S. 825, 833 (1994) (citations omitted); Rodriguez v. Secretary for the Dept. Of

Corrections, 508 F.3d 611, 616–17 (11th Cir. 2007); Purcell ex. Rel. Estate of Morgan v. Toombs

County, Ga., 400 F.3d 1313, 1319 (11th Cir. 2005); Carter v. Galloway, 352 F.3d 1346, 1349 (11th

Cir. 2003). Not every injury suffered by one prisoner at the hands of another, however, translates into

constitutional liability for the prison officials responsible for the victim's safety. Farmer, 511 U.S.

at 834; Purcell; Galloway, *supra*. To be held liable under the Eighth Amendment for failing to prevent

an attack from other inmates, a correctional official must be found to have known of and recklessly

disregarded "an excessive risk to inmate health or safety; the official must both be aware of facts from

which the inference could be drawn that a substantial risk of serious harm exists, and he must also

draw the inference." Farmer, 511 U.S. at 837; Purcell, 400 F.3d at 1319–20 (plaintiff must "produce

sufficient evidence of (1) a substantial risk of serious harm; (2) the defendants' deliberate indifference

to that risk; and (3) causation.") (citation omitted); Rodriguez, *supra*. When officials become aware

of threats to an inmate's health and safety, the Eighth Amendment proscription against cruel and

unusual punishment imposes a duty to provide reasonable protection. <u>McCoy</u>, 47 F.3d at 407; <u>Marsh v. Butler County, Alabama</u>, 268 F.3d 1014, 1027 (11th Cir. 2001).

It is not appropriate to use hindsight to determine whether conditions of confinement amounted to "cruel and unusual" punishment. <u>Purcell</u>, 400 F.3d at 1320 (citing <u>Brown v. Hughes</u>, 894 F.2d 1533, 1537 (11th Cir. 1990)). Whether an officer was aware of a risk of serious harm may be deduced from circumstantial evidence such as the obviousness of the situation confronting the officer. <u>Farmer</u>, 511 U.S. at 841. The risk of attack must have been substantial, beyond mere possibility. <u>Brown v. Hughes</u>, 894 F.2d at 1537. Absent special circumstances, general hostilities exhibited by prisoners do not alone amount to a "substantial risk of serious harm." *See* <u>Galloway</u>, 352 F.3d at 1349 (mere awareness of inmate's "generally problematic nature" insufficient)[12]; <u>Brown</u>, 894 F.2d at 1537 (declining to hold liable defendants who had been informed of "racial problem" in victim's cell). Furthermore, "prison officials who actually knew of a substantial risk to inmate health or safety may be found free from liability if they responded reasonably to the risk, even if the harm ultimately was not averted." <u>Farmer</u>, 511 U.S. at 844. With respect to a failure to intervene at the time of an actual attack, an individual who was present at the time of an alleged assault can be held liable only if there was a reasonable opportunity to intervene. *See* <u>Hadley v. Gutierrez</u>, 526 F.3d 1324, 1331 (11th Cir. 2008) (citing <u>Priester v. City of Rivera Beach, FL</u>, 208 F.3d 919, 924 (11th Cir. 2000)); *see also* <u>Ensley v. Soper</u>, 142 F.3d 1402, 1407–08 (11th Cir. 1998); <u>Byrd v. Clark</u>, 783 F.2d 1002, 1007 (11th Cir. 1986); <u>Yang v. Hardin,</u> 37 F.3d 282, 285 (7th Cir. 1994). A merely negligent failure to protect an inmate does not state a claim under § 1983. <u>Galloway</u>, 352 F.3d at 1350; <u>Brown</u>, 894 F.2d at 1537; <u>Davidson v. Cannon</u>, 474 U.S. 344, 347–48 (1986).

Defendants Given, Slattery, Weekly, Fenner, and Smith contend they are entitled to summary judgment on Plaintiff's failure-to-protect claim because Plaintiff can produce nothing more than a scintilla of evidence demonstrating he was raped, and the evidence in fact shows he was not raped.

The court addresses the various reasons cited by Defendants for concluding that the evidence shows no rape occurred. Defendants first point to the November 2010 evidence from Duval County Jail, which they say reflects Plaintiff's report that he had not had any sexual partners in the previous

---

[12] The <u>Galloway</u> court further noted that defendants are not required to "read imaginatively all derogatory and argumentative statements made between prisoners to determine whether substantial risks of serious harm exist." <u>Galloway</u>, 352 F.3d at 1350.

twelve months and that he had never had sex with a male (defense exh. C at 1).[13]  That Plaintiff did not disclose the alleged sexual encounter with Pope is not proof that no rape occurred.  While a jury might find that the medical information contained in the report undermined Plaintiff's claim of rape, it might also find that Plaintiff failed to disclose the sexual encounter for the reasons he asserts, i.e., as a "defense mechanism" or as a "coping skill[ ]" (plaintiff's exh. B at 4).

Defendants also contend that the evidence shows that Nurse Donahoo noted no injuries during Plaintiff's initial medical examination at 5:50 p.m. and that his injuries only appeared hours later and likely were self-inflicted.  Defendants' evidence is that during her first examination of Plaintiff, Nurse Donahoo viewed all of Plaintiff's body, including his anus, and noted no injuries, and that at her second examination she noted some red marks on his forehead which had not been present at her earlier examination or she would have reported them (defense exh. C at 21, 23, exh. L, exh. B at 39).  Plaintiff contends that he was completely clothed when Nurse Donahoo first assessed him (plaintiff's exh. B at 3, exh. B1 at 2–3, exh. H ); presumably, she was thereby precluded from assessing Plaintiff's anus at that time.  Plaintiff also denies that he self-inflicted injuries to his forehead or rectum and notes that he was monitored by a guard and a camera while celled alone for six hours after the examination (and there is no evidence either the guard or the camera monitor detected Plaintiff abusing himself) (plaintiff's exh. B at 3, 4, exh. H).

Nurse Donahoo does not report that she examined Plaintiff's rectum at either of her two examinations.  The SART nurse did, however, during her examination, and the Inspector General's Report includes her finding of reddened and raw areas at the top and bottom of Plaintiff's rectum (plaintiff's exh. B at 3, exh. R at 4).  Given the contradictory evidence, there is a disputed factual issue regarding whether the reddened and raw areas in Plaintiff's rectum and the red marks on Plaintiff's forehead could have resulted from self-inflicted injury or other trauma, as Defendants submit, or whether they could have resulted from the alleged rape by Pope, as Plaintiff submits.

Defendants also assert that Plaintiff admitted to two correctional officers that he had not been raped but was merely trying to get a different dormitory assignment.  In fact, the affidavits of Defendants Johnson and Roberts—who together escorted Plaintiff to medical—differ in this regard.

---

[13] The jail record cited by Defendants, while handwritten and not entirely clear, in fact appears to indicate that Plaintiff reported having had six different female sexual partners in the prior twelve months, although it does indicate—as Defendants note—that Plaintiff denied ever having had sex with a male (*see* defense exh. C at 1).

Defendant Roberts reported that during the escort Plaintiff said he had not been raped but had contended otherwise to get out of the dormitory (defense exh. B at 15).  Defendant Johnson, on the other hand, stated that during the escort Plaintiff indicated he wanted to get out of the dormitory and did not care how he did it; Defendant Johnson makes no mention of Plaintiff's disclaiming the rape (*id.*, exh. B at 13).  Moreover, Plaintiff denies making such a statement to anyone (plaintiff's exh. B at 4).  Defendants also assert that Pope had no history of sexual assault, citing Plaintiff's deposition (defense exh. A at 118–19).  Plaintiff's testimony actually is that he had no first-hand knowledge of other sexual assaults committed by Pope (*id.*).  Even if it is correct that Pope had no known record of sexual *assault*, Plaintiff points to evidence indicating that Pope had approximately thirty sexual misconduct disciplinary reports for masturbating and, more importantly, that Pope's color-coded "face" sheet on the cell door—which would have been readily visible and recognizable to correctional officers—indicated Pope was a high risk sexual predator (plaintiff's exh. H at 1; exh. B at 1).  Also, the fact that Pope "adamantly" denies having committed a criminal offense, e.g., sexually assaulting Plaintiff, of course is not proof that Pope did not commit this crime.  Moreover, the assertion that Plaintiff is an admitted liar and lied during his deposition, while an accurate statement on its face, can also be described as not fairly characterizing all of Plaintiff's testimony.[14]

Defendants also argue that the Office of the State Attorney's declining to go forward with a criminal prosecution against Pope due to insufficient evidence is further proof that the rape did not occur (defense exh. B).  It is not.  Rather, it simply supports the conclusion, which is explicitly stated

---

[14] Defendants are correct that Plaintiff asserted on several occasions during the deposition that he did not lie (defense exh. A at 4, 19, 23, 49), but then, in response to an apparent question by defense counsel concerning what he had disclosed about the July 8, 2010, incident and when and to whom he had disclosed it, Plaintiff responded, "Sir, to be truthful, when most people ask me about what happened in the cell, I lie to them.  I lie to them." (*Id.* at 76).  Challenged by counsel about his truthfulness, Plaintiff responded, "I lie under them circumstances . . . [i]n order to protect myself." (*Id.* at 77).  Counsel then asked, "In order to protect yourself and your interest, including this lawsuit, correct, so you can get some money out of these officers over the lies that you're telling so you can protect yourself and get some money, correct?"  When Plaintiff responded by asking if he could go on with what he had been saying, counsel continued, "I want to know why you lie, when you lie, and who you lie to, because you just told me you didn't lie at the beginning of this deposition.  Now you're telling me you lie. . . ."  Plaintiff responded, "I lie in order to protect my safety.  If an inmate asks me what happened . . . ."  Counsel interrupted, "And your interest, you just said you'd lie to protect yourself and your interest" (*id.*).

As this exchange reveals, Plaintiff did not testify that he would lie to protect a financial "interest"; that term was counsel's.  Plaintiff did admit to lying to protect his safety.  While this does, as Defendants assert, make Plaintiff an admitted liar who lied during his deposition (when he stated he did not lie), the context and entirety of Plaintiff's testimony must also be taken into consideration.

in the informally rendered opinion (provided via email), that a criminal prosecution against Pope likely would not be successful "[u]nless there is something more to prove the charge" since "[i]t appears that this case comes down to the victim's word versus the defendant's" (*id.* at 39). Finally, Defendants contend that no rape occurred because there is no physical evidence of rape, including evidence of saliva in Plaintiff's anus. According to Defendants, "[c]ertainly, if Mr. Pope had anally raped Plaintiff after forcing Plaintiff to perform fellatio for over an hour, the tests would have returned positive for saliva. Also, the buccal and anal swab tests were negative for any sign of semen" (doc. 102 at 8 n.5). Defendants rely on no expert authority for their implied proposition that a lack of positive findings for saliva and semen in rectal test samples obtained some nine hours or more after an alleged assault supports the conclusion that no rape occurred.[15] This argument simply is not persuasive.

In short, resolving all factual disputes in Plaintiff's favor, as it must at summary judgment, the court concludes that Plaintiff has come forward with sufficient evidence to create a jury question as to whether Pope in fact raped Plaintiff.

The court is also satisfied that Plaintiff has met his burden with respect to showing that prior to the alleged rape Defendants Given, Weekly, Slattery, Smith, and Fenner were aware that Plaintiff was in fear of being sexually assaulted by Pope yet failed to take any action to protect him from the assault. While Defendant Given denies that Plaintiff ever informed him on July 8, 2010, that he feared being raped by Pope (defense exhibit F), Plaintiff has submitted evidence to the contrary. This evidence reflects that at approximately 8:00 a.m., on July 8, 2010, Plaintiff informed Defendant Given of Pope's menacing conduct, Plaintiff's fear of being raped by Pope, and Plaintiff's request for assistance but that Defendant Given rejected his plea for protection (doc. 23 at 8–9, exh. G at 4, 9). Plaintiff's evidence also reflects that when he informed Defendant Smith that Pope had choked him and tried to force him to perform oral sex, Defendant Smith indicated he would go "for help" but never returned or took any action to protect Plaintiff (doc. 23 at 10, exh. G at 9, exh. C at 4). Other than representing to the court that he has no recollection of interacting with Plaintiff on the day in question (through counsel in connection with the motion for sanctions (*see* doc. 128)), Defendant Smith has not

---

[15] Nor do Defendants mention that the Sexual Assault Kit performed on Plaintiff "gave chemical indications for the presence of blood," which could be consistent with Plaintiff's allegations of bleeding after being sodomized (defense exh. B at 6).

responded to Plaintiff's assertions. Accordingly, as the record now before the court consists of conflicting or undisputed evidence concerning the facts known to Defendants Given and Smith prior to the alleged rape, a jury question exists as to whether on July 8, 2010, these Defendants acted with deliberate indifference to a substantial risk that Pope would sexually assault Plaintiff.

Defendants Weekly, Slattery, and Fenner also deny that Plaintiff informed them on the date in question that he was in fear of being raped by Pope (defense exhs. G, H, I). Plaintiff contends otherwise, stating that during security checks prior to the alleged assault he personally informed Defendants Weekly, Slattery, and Fenner of Pope's threats and Plaintiff's fear that Pope would rape him (doc. 23 at 9, plaintiff's exh. A at 30–33, exh. G at 2–3, exh. K at 1–5). Considering this conflicting evidence, a jury question exists as to whether Defendants Slattery, Weekly, and Fenner acted with deliberate indifference to a substantial risk that Plaintiff would be sexually assaulted by Pope. This conclusion is not altered by the argument advanced by Defendants Slattery, Weekly, and Fenner that even if a rape did occur, there is no evidence they acted unreasonably given the limited information known to them (doc. 102 at 9–10). These Defendants contend their knowledge was limited because they could not see inside the cell due to a towel covering the window, Pope stopped the alleged assault every time a guard passed by, and Pope did not have a history of sexual assault (doc. 102 at 9 n.6). Moreover, Defendant Fenner advised Plaintiff to write a grievance about the matter, and Defendants Weekly and Slattery stated they would inform Defendant Given about Plaintiff's concerns (defense exh. A at 30–32). At worst, Defendants submit, under these facts any failure to protect Plaintiff constituted negligence.

As discussed previously, Plaintiff has presented evidence that on July 8, 2010, prior to the time of the alleged rape, Plaintiff informed Defendants Slattery, Weekly, and Fenner that Pope had threatened to rape him (plaintiff's exh. B at 1). Plaintiff's evidence also shows that the color-coded "face" sheet on the cell door indicated Pope was a high risk sexual predator (*id.*). This evidence, if accepted by a jury, would suggest that Defendants Slattery, Weekly, and Fenner acted unreasonably, and not merely negligently, if they ignored a covered cell window and thus the activities, intermittent or not, that could be taking place behind it. Moreover, if there was an imminent risk of harm to Plaintiff, Defendant Fenner's telling him to file a grievance in the matter—which even if granted could provide no immediate relief—would be unreasonable, not simply negligent. Also, as Plaintiff states,

there is no evidence that Defendants Weekly or Slattery ever actually informed Defendant Given about Plaintiff's fear of being raped by Pope; in any event, even if there were such evidence it would be completely at odds with Defendants' argument that Plaintiff never informed them that he feared being raped by Pope.  For all of these reasons, at this summary judgment phase of the proceedings, Defendants Slattery, Weekly, and Fenner's contention that their conduct at most was negligent should be rejected.

In summary, this court concludes that Plaintiff has presented sufficient evidence to withstand summary judgment on his failure-to-protect claim against Defendants Given, Slattery, Weekly, Fenner, and Smith.  As to this claim, therefore, it is recommended that Defendants' motion be denied.

B.     Denial of Timely and Adequate Medical Care

Stating an Eighth Amendment claim of denial of adequate medical care requires satisfying both an objective and subjective component.  Taylor v. Adams, 221 F.3d 1254, 1257 (11th Cir. 2000). First, there must be conduct by prison officials which, objectively speaking, is "sufficiently serious" to constitute a deprivation "'denying the minimal civilized measure of life's necessities.'"  *Id.* (quoting Wilson v. Seiter, 501 U.S. 294, 298, 111 S. Ct. 2321, 115 L. Ed. 2d 271 (1991) (internal quotation omitted)).  Second, the prison officials must possess a subjective intent to use the medical deprivation as a means of punishment.  *Id.* (citations omitted).

Both the objective and subjective components encompass two subsidiary requirements. Taylor, 221 F.3d at 1258.  As to the objective prong, an objectively serious deprivation requires showing an objectively "serious medical need."  Estelle, 429 U.S. at 104.  A serious medical need is "one that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention." Hill v. DeKalb Reg'l Youth Det. Ctr., 40 F.3d 1176, 1186 (11th Cir. 1994), *abrogated on other grounds by* Hope v. Pelzer, 536 U.S. 730, 122 S. Ct. 2508, 153 L. Ed. 2d 666 (2002); *see* Farmer v. Brennan, 511 U.S. 825, 834, 114 S. Ct. 1970, 128 L. Ed. 2d 811 (1994) (serious medical need is one that, if left unattended, "pos[es] a substantial risk of serious harm.").  In addition, an objectively serious deprivation requires showing the response made by the defendant to that need was so deficient as to constitute "an unnecessary and wanton infliction of pain."  Estelle, 429 U.S. at 105–06 (internal quotation marks omitted); *see* Taylor, 221 F.3d at 1257; *see also* Adams v. Poag, 61 F.3d 1537, 1543–44 (11th Cir. 1995).

To show the required subjective intent to punish, the plaintiff must demonstrate that the defendant acted with an attitude of "deliberate indifference."  Estelle, 429 U.S. at 105.  "Deliberate indifference has three components:  (1) subjective knowledge of a risk of serious harm; (2) disregard of that risk; (3) by conduct that is more than mere negligence."  Farrow v. West, 320 F.3d 1235, 1245–46 (11th Cir. 2003) (citing McElligott v. Foley, 182 F.3d 1248, 1255 (11th Cir. 1999) and Taylor, 221 F.3d at 1258 (stating that defendant must have subjective awareness of an "objectively

serious need" and that his response must constitute "an objectively insufficient response to that need"))
(emphasis added).

A delay in providing medical treatment can constitute deliberate indifference. Estelle, 429
U.S. at 104–05.  Nevertheless, "[a]n inmate who complains that delay in medical treatment rose to a
constitutional violation must place verifying medical evidence in the record to establish the
detrimental effect of delay in medical treatment to succeed." Townsend v. Jefferson Cnty., 582 F.3d
1252, 1259 (11th Cir. 2009).  "Cases stating a constitutional claim for immediate or emergency
medical attention have concerned medical needs that are obvious even to a layperson because they
involve life-threatening conditions or situations where it is apparent that delay would detrimentally
exacerbate the medical problem."  See Youmans v. Gagnon, 626 F.3d 557, 561 (11th Cir. 2010)
(concluding that plaintiff had not established serious medical need when he had "several cuts and
abrasions on his head, face, shoulder, elbow, and hand" and appeared to be bleeding slightly); Adams,
61 F.3d at 1539–41, 1543 (holding that asthma, causing continual breathing problems with intermittent
wheezing, coughing, and hyperventilating can constitute serious medical need); Brown v. Hughes, 894
F.2d 1533, 1538 (11th Cir. 1990) (finding that painful broken foot can be serious medical need).

In the instant case, Defendants Given, Williams, Slattery, Johnson, Roberts, and Nolan argue
that Plaintiff has not shown he had a serious medical need; also, he was seen by medical personnel
within hours of the alleged incident and received adequate care (doc. 102 at 12).  Plaintiff asserts that
Defendants knew he had been raped, knew he was bleeding from his rectum, and knew he was in
"excruciating" pain, yet for five hours after the attack refused to provide him with any over-the counter
pain medication or medical treatment (doc. 111 at 19; doc. 23 at 9, 10–11).

Plaintiff had a medical need to be examined and treated, and he did receive such care after the
alleged assault, albeit not immediately afterward.  The  court concludes, however, that the rectal
bleeding, rectal pain, and other complaints[16] described by Plaintiff did not constitute needs so serious
that left unattended for approximately four to five hours they posed a substantial risk of serious harm
to him.  Farmer, 511 U.S. at 834.  They were not so obvious "that even a lay person would easily
recognize the necessity for a doctor's attention." Hill, 40 F.3d at 1186.  First, the amount of blood

---

[16] Plaintiff alleges that he had a bruise on his head from being knocked against the wall by Pope and, as a result
of being forced to perform oral sex, he "suffered from nausea, [a] sore neck, and [the] effects of choking and gagging"
(doc. 23 at 15).  These claims clearly involve de minimis injury.

loss Plaintiff describes he experienced immediately following the alleged assault—enough to be visible on his underwear and a napkin he used to wipe himself, to transfer to his fingers, and to "drip" down his leg—appears to have been fairly minimal and self-limiting.  It is not comparable, for example, to the amount of blood involved in Aldridge v. Montgomery, 753 F.2d 970, 971–72 (11th Cir. 1985), where the court found that a one and one-half inch cut that bled continuously for two hours, forming a pool of blood approximately the size of two hands and later requiring six sutures to close, presented a serious medical need.  Indeed, in Plaintiff's case, he does not assert that any medical treatment was needed, much less administered, to staunch the drip of blood from what Plaintiff acknowledges were merely "reddened" and "raw" areas in his rectum; there is no evidence that Plaintiff sustained any tears, cuts, or other significant injuries to his rectum that might have resulted in copious bleeding or that he in fact suffered more serious bleeding.  Based on the evidence Plaintiff has placed before the court, the blood loss involved was not life-threatening, and it did not present a threat of further or irreparable injury: it was minor.[17]  Plaintiff has failed to introduce medical evidence establishing that a delay in being examined exacerbated his condition in any way.  For these reasons, the court concludes that Plaintiff has not shown that the rectal bleeding he experienced after the alleged rape by Pope constituted a serious medical need.

        The same is true with respect to the rectal pain Plaintiff asserts he experienced immediately following the alleged assault and for several weeks afterward (doc. 23 at 14).  As previously noted,

---

[17] There is no medical evidence that shows Plaintiff was experiencing significant rectal bleeding at the 11:30 p.m. examination by the SART nurse (or in the hours prior to that time) or that supports Plaintiff's assertion that he felt dizzy and "overwhelmed with numbness as he continued to lose blood" (doc. 111 at 20, referencing doc. 23 at 15). As noted previously, Plaintiff complains that the SART nurse's original examination report "accurately documented" his complaints but has "mysteriously disappeared" (doc. 111 at 20 n.1).  Plaintiff does not, however, assert that during discovery he demanded this specific medical record—which was known to him—but Defendants failed to provide it. Nor does the docket reflect that Plaintiff ever sought the court's assistance in obtaining this particular record, although it shows that on three occasions during discovery Plaintiff filed motions to compel on other issues (see docs. 80, 86, 91).        Even if evidence did exist which showed Plaintiff reported dizziness and numbness, however, such evidence would record subjective, not objective, information.  And even if there was objective evidence that showed Plaintiff was experiencing rectal bleeding at the 11:30 p.m. examination (and the Sexual Assault Kit does show chemical evidence of the presence of blood, though not the quantity of blood detected (see defense exh. B at 6)), Plaintiff does not contend that he needed or received any treatment whatsoever for blood loss.  For example, he does not suggest that any surgical procedures or pharmaceutical therapies were indicated or used to control blood loss or that he needed a blood transfusion to replace lost blood.  Accordingly, the court concludes that even if Plaintiff had produced the SART nurse's original medical report, based on his description of its contents there would be no basis for altering the conclusion that he suffered only a minimal amount of blood loss.

the SART nurse described the areas of injury to Plaintiff's rectum as being merely "reddened" and "raw," which does not implicate a serious level of associated pain. Furthermore, a condition warranting only over-the-counter pain medication—which Plaintiff says he requested from certain Defendants but was denied—is not "serious." Montes v. Ponce Municipality, 79 F. App'x 448, 451 (1st Cir. 2003); Guarneri v. Hazzard, Case No. 9:06cv985 (NAM/DRH), 2010 WL 1064330, at *15 (N.D.N.Y. Mar. 22, 2010) (back pain prompting requests for "simple Ibuprofen and similar over-the-counter medications" did not amount to serious medical need); Washington v. Yvette, Case No. 6:09cv-1432, 2010 WL 1418590, at *4 (W.D. La. Mar. 17, 2010) (neck and back complaints that a nonincarcerated person would treat with over-the-counter, at-home remedies, as opposed to emergency or specialized medical care, did not rise to the level of a "serious medical need," but rather were "in the realm of a *de minimis* injury, and as such ha[d] no constitutional significance").[18] Also, that a correctional officer who is untrained in medicine and has not been authorized by a medical professional to administer even over-the-counter pain medication to a prisoner/patient who contends he is bleeding after being sodomized does not amount to deliberate indifference. Rather, providing a pain relieving drug to such a patient could be contraindicated. Plaintiff's claim that some of the Defendants refused to provide him with over-the-counter pain medication after the alleged rape therefore fails.

Additionally, Plaintiff has not come forward with evidence that shows his rectal or abdominal pain was so serious that it implicated a life-threatening situation, one which even a layperson would have recognized required medical attention immediately after the alleged assault. Plaintiff contends his pain was relieved only when he was given pain medication at approximately 6:00 p.m. on the date in question (doc. 111 at 21), but he has not provided any verifying medical evidence, such as a medical notation indicating that he required medication for severe pain or the type of medication he was prescribed. The only medical evidence Plaintiff has placed in the record involving treatment he

---

[18] Plaintiff cites Aldridge v. Montgomery, 753 F.2d 970 (11th Cir. 1985), discussed *supra*, apparently for the proposition that a jury question exists with regard to whether prison officials' denying a prisoner an ice pack and aspirin for pain constitutes deliberate indifference to a serious medical need (doc. 111 at 21). To the extent the Eleventh Circuit reversed the directed verdict for the defendants on the issue of whether failing to provide an ice pack and aspirin involved a constitutional violation, *see id.* at 973 (concluding "that the first issue raised by these opposing contentions could not be resolved by a directed verdict" but apparently referring to second issue concerning serious bleeding cut), the instant case is distinguishable. Unlike this case, Aldridge involved allegations that the defendants refused to provide treatment with an ice pack and aspirin that had previously been prescribed by a physician. *Id.* at 972.

received in connection with the July 8, 2010 incident comes from SRCI, and it does not list any pain medications, only the antibiotic Septra DS and the anti-HIV [human immunodeficiency virus] medications Kaletra, Epivir, and AZT[19] Plaintiff was prescribed (*see* plaintiff's exh. B1 at 5). Plaintiff asserts that the blood pathogen protocol that was initiated at approximately 6:00 p.m. included pain medication (doc. 111 at 12 n.6), but there is no specific mention in the record of a prescription for pain medication (*see* plaintiff's exh. B1 at 1). If at the examination conducted at approximately 6:00 p.m. Plaintiff was given the over-the-counter pain medication he had earlier requested from Defendants, he does not so state. And if the pain medication was of the over-the-counter variety, as noted above, a condition warranting only this type of drug is not considered a serious medical need. In any event, Plaintiff has not come forward with evidence showing that the pain of which he complains was so obvious, so severe that it clearly mandated immediate attention or that a four to five hour delay in being examined and receiving pain medication exacerbated his condition. Plaintiff thus has not shown that his rectal or abdominal pain or any other of his complaints constituted a serious medical need.

For the above reasons, the court concludes that Plaintiff has failed to satisfy his summary judgment burden with respect to his claim that Defendants Given, Williams, Slattery, Johnson, Roberts, and Nolan were deliberately indifferent to his serious medical needs. As to this claim, therefore, it is recommended that Defendants' motion be granted.

C.      Retaliation

The First Amendment forbids prison officials from retaliating against prisoners for exercising the right of free speech. Farrow v. West, 320 F.3d 1235, 1248 (11th Cir. 2003) (citations omitted); Adams v. James, 784 F.2d 1077, 1080 (11th Cir. 1986) (citation omitted); *see also* Mitchell v. Farcass, 112 F.3d 1483, 1490 (11th Cir. 1997); Wright v. Newsome, 795 F.2d 964, 968 (11th Cir. 1986). "A prisoner can establish retaliation by demonstrating that the prison official's actions were the result of his having filed a grievance concerning the conditions of his imprisonment." Farrow, 320 F.3d at 1248 (internal quotation and citation omitted).

---

[19]      *See* National Institutes of Health website, http://aidsinfo.nih.gov/drugs/401/sulfamethoxazole, http://aidsinfo.nih.gov/drugs/316/kaletra/0/patient, http://aidsinfo.nih.gov/drugs/126/lamivudine/0/patient, and http://aidsinfo.nih.gov/drugs/4/zidovudine/0/patient (last visited February 24, 2014).

In this case, Defendant Given contends that Plaintiff's retaliation claim against him fails because Plaintiff has not shown that he was raped (doc. 102 at 12). As set forth above, the court concludes that Plaintiff has come forward with sufficient evidence to present this issue to a jury. For that reason, and also because there is evidence that "[Defendant] Given was subjectively motivated to deny Plaintiff protection from Mr. Pope because Plaintiff [had an extensive history of filing] grievances" (doc. 111 at 16), the court recommends that Plaintiff's retaliation claim against Defendant Given be permitted to go forward. Thus Defendants' motion as to this claim should be denied.

D.    Limitation on Recovery[20]

In this case, Plaintiff asserts that in addition to the physical harm he experienced, following the incident he has suffered panic attacks, sleeplessness, anxiety, mental anguish, emotional distress, and depression (doc. 111 at 15, referencing exhs. Q1, R1, S1 at 4, 7–8). Defendants assert that, pursuant to 42 U.S.C. § 1997e(e) of the Prison Litigation Reform Act ("PLRA"), Plaintiff may not recover compensatory or punitive damages because he cannot demonstrate that he suffered physical injury (doc. 102 at 12–13).

Title 42 U.S.C. § 1997e(e) provides: "No Federal civil action may be brought by a prisoner confined in a jail, prison, or other correctional facility, for mental or emotional injury suffered while in custody without a prior showing of physical injury." The Eleventh Circuit has decided that the phrase "Federal civil actions" means all federal claims, including constitutional claims. Napier v. Preslicka, 314 F.3d 528, 532 (11th Cir. 2000) (citation omitted). Where a prisoner plaintiff alleges constitutional violations he is prevented under § 1997e(e) from seeking punitive or compensatory damages in the absence of a physical injury. Smith v. Allen, 502 F.3d 1255, 1271 (11th Cir. 2007) *abrogated on other grounds by* Sossamon v. Texas, ____U.S.____, 131 S. Ct. 1651, 179 L. Ed. 2d

---

[20] Plaintiff appears to sue Defendants in their individual capacities only (doc. 1 at 17). To the extent Plaintiff would seek to sue Defendants in their official capacities for damages, however, such suit would be barred by the Eleventh Amendment. *See* Miller v. King, 384 F.3d 1248 (11th Cir. 2004) (a plaintiff may not bring a § 1983 action for monetary damages against the state or state officials in their official capacities). Absent waiver or express congressional abrogation, the Eleventh Amendment prohibits a suit brought by a private individual against a state in federal court. *See* Federal Maritime Commission v. South Carolina State Ports Authority, 535 U.S. 743, 765–78, 122 S. Ct. 1864, 152 L. Ed. 2d 962 (2002); Kentucky v. Graham, 473 U.S. 159, 167 n.14, 105 S. Ct. 3099, 87 L. Ed. 2d 114 (1985); Gamble v. Florida Department of Heath and Rehabilitative Services, 779 F.2d 1509, 1511 (11th Cir. 1986). A suit against a state employee in his official capacity is deemed to be a suit against the state for Eleventh Amendment purposes. Will v. Michigan Dept. of State Police, 491 U.S. 58, 71, 109 S. Ct. 2304, 105 L. Ed. 2d 45 (1989).

700 (2011)); *see also* <u>Al-Amin v. Smith</u>, 637 F.3d 1192, 1199 (11th Cir. 2011) (noting that <u>Napier</u> court, by affirming dismissal of Napier's entire claim, "concluded, albeit *sub silentio*, that Napier's punitive claim was barred by § 1997e(e) just as much as his compensatory claim.").

"In order to avoid dismissal under § 1997e(e), a prisoner's claims for emotional or mental injury must be accompanied by allegations of physical injuries that are greater than *de minimis*." <u>Mitchell v. Brown & Williamson Tobacco Corp.</u>, 294 F.3d 1309, 1312–13 (11th Cir. 2002); *see also* <u>Mann v. McNeil</u>, 360 F. App'x 31, 32 (11th Cir. 2010) (holding that § 1997e(e) barred inmate's claims for monetary damages; inmate's complaints of vague injuries to his back and scrapes and marks on his knees and legs did not amount to more than *de minimis* physical injury); <u>Nolin v. Isbell</u>, 207 F.3d 1253, 1258 n.4 (11th Cir. 2000) (bruises received during an arrest were non-actionable *de minimis* injury); <u>Quinlan v. Personal Transp. Servs. Co.</u>, 329 F. App'x 246, 249 (11th Cir. 2009) (holding that § 1997e(e) barred pre-trial detainee's claims for compensatory and punitive damages; complaints of temporary chest pain, headache and difficulty breathing while in transport van, as well as subsequent "continuous back pain in [his] lower back that periodically cause[d] [him] to walk hunched over," did not constitute more than *de minimis* physical injury required under § 1997e(e), since none of the conditions required immediate medical attention or evidenced physical injury besides discomfort).

In <u>Harris v. Garner</u>, 190 F.3d 1279, 1286–87 (11th Cir. 1999), *reh'g en banc granted and opinion vacated*, 197 F.3d 1059 (11th Cir.1999), *opinion reinstated in relevant part en banc*, 216 F.3d 970 (11th Cir. 2000)), with respect to a prisoner inmate's complaint that he was forced to "dry shave," the court stated that the physical injury analysis under section 1997e(e) should be fused "with the framework set out by the Supreme Court in <u>Hudson</u> [v. McMillian, 503 U.S. 1, 112 S. Ct. 995, 117 L. Ed. 2d 156 (1992)] for analyzing claims brought under the Eighth Amendment for cruel and unusual punishment, and h[e]ld that in order to satisfy section 1997e(e) the physical injury must be more than *de minimis*, but need not be significant." <u>Harris</u>, 190 F.3d at 1286. The court also stated that it had "never held that a prisoner must allege a physical injury in order to make out a cognizable claim under the Eighth Amendment. Indeed, some of our cases suggest the contrary." *Id.* at 1287. Commenting further in a footnote, the court stated:

> We do not resolve the question whether *de minimis* uses of physical force might
> satisfy section 1997e(e) if they are of the sort "repugnant to the conscience of

> mankind," <u>Hudson</u>, 503 U.S. at 10, 112 S. Ct. at 1000, (citation and internal quotation marks omitted), because we find that on this record the question is not presented. [The inmate's] forced "dry shave" is not the sort of physical force "repugnant to the conscience of mankind."

*Id.* at 1287 n.7.

This court has concluded that Plaintiff's alleged physical injuries (rectal bleeding, rectal pain, head bruise, etc.) resulting from the alleged rape were not serious. Being *de minimis* in nature, these injuries are insufficient to satisfy § 1997e(e)'s physical injury requirement.

Continuing its inquiry, the court notes that the Eighth and Second Circuits have concluded that even in the absence of physical harm a sexual assault by a guard can constitute a qualifying "physical injury" under the PLRA. *See, e.g.*, <u>Kahle v. Leonard</u>, 563 F.3d 736, 741–42 (8th Cir. 2009) (finding that male guard's sexual assault of female prisoner amounted to requisite "physical injury" under § 1997e(e)); <u>Liner v. Goord</u>, 196 F.3d 132, 135 (2d Cir. 1999) (stating that guards' "alleged sexual assaults qualify as physical injuries as a matter of common sense. Certainly, the alleged sexual assaults would constitute more than *de minimis* injury if they occurred."). Under these cases, a prison guard's consciously permitting one inmate to be sexually assaulted by another inmate might satisfy § 1997e(e)'s physical injury requirement. In any event, as previously noted, in this case the court has concluded that a jury question exists as to whether Defendants Given, Slattery, Weekly, Fenner, and Smith were aware of the risk that Pope would rape Plaintiff but intentionally refused to protect him from Pope's sexual assault. In this court's view, such conduct—if accepted as true by a jury—is "repugnant to the conscience of mankind."[21] At this stage of the proceedings, therefore, this court concludes that Plaintiff's claims for mental and emotional harm should be permitted to proceed.

VI.    CONCLUSION

For the reasons stated above, the court denies Plaintiff's motion for sanctions and directs the clerk to seal Plaintiff's response in opposition to the motion for summary judgment. Additionally, the court recommends that Defendants' motion for summary judgment be denied with respect to Plaintiff's

---

[21] As outlined above, there is evidence that Defendants Given, Weekly, Fenner, and Slattery were aware that Pope was "trying to take [Plaintiff's] ass," in other words, to rape him, and that Plaintiff requested protection (*see* exh. J). If a jury accepted Plaintiff's evidence that Defendants were in agreement that Plaintiff should have to "fight for his ass" despite this knowledge (*see id.*), it would be consistent to find that Defendants' conduct under these circumstances was "repugnant to the conscience of mankind."

failure-to-protect and retaliation claims and be granted with respect to his medical claim.

Accordingly it is **ORDERED**:

1.    That Plaintiff's motion for sanctions (doc. 126) is **DENIED**.

2.    That the clerk **SEAL** Plaintiff's response in opposition to the motion for summary judgment (doc. 111, including exhibits at doc. 111-1).

And it is respectfully **RECOMMENDED**:

That the motion for summary judgment filed by Defendants (doc. 102) be **GRANTED IN PART AND DENIED IN PART AS FOLLOWS:**

1.    That the motion be **DENIED** with respect to Plaintiff's failure-to-protect claim against Defendants Given, Slattery, Weekly, Fenner, and Smith.

2.    That the motion be **DENIED** with respect to Plaintiff's retaliation claim against Defendant Given.

3.    That the motion be **GRANTED** with respect to Plaintiff's medical claim against Defendants Given, Williams, Slattery, Johnson, Roberts, and Nolan.  As no claims remain against Defendants Williams, Johnson, Roberts, and Nolan, these Defendants should be **DISMISSED** from this action.

At Pensacola, Florida, this 24<u>th</u> day of February 2014.


/s/ *Elizabeth M. Timothy*
**ELIZABETH M. TIMOTHY**
**UNITED STATES MAGISTRATE JUDGE**

## NOTICE TO THE PARTIES

Objections to these proposed findings and recommendations may be filed within fourteen (14) days after being served a copy thereof. **Any different deadline that may appear on the electronic docket is for the court's internal use only and does not control.** A copy of objections shall be served upon the magistrate judge and all other parties. Failure to object may limit the scope of appellate review of factual findings. *See* 28 U.S.C. § 636; United States v. Roberts, 858 F.2d 698, 701 (11th Cir. 1988).